**Juanita BOBO, Plaintiff,**

v.

**WOLVERINE WORLDWIDE, INC., Defendant.**

**No. J–C–97–293.**

United States District Court, E.D. Arkansas, Jonesboro Division.

June 10, 1998.

Christopher Leif Hamman, Jonesboro, AR, for Plaintiff.

Christopher E. Moore, Richard D. Bennett, Weintraub, Stock, Bennett, Grisham & Underwood, P.C., Memphis, TN, for Defendant

## ORDER

ROY, District Judge.

The case before the Court is a race discrimination claim brought pursuant to the Arkansas Civil Rights Act, A.C.A. 16–123–107, *et seq.* Originally filed in the Circuit Court of Craighead County, the defendant removed the case to federal district court based on this court's diversity jurisdiction. Now pending before the Court and ripe for ruling is defendant Wolverine Worldwide, Inc.'s motion for summary judgment [DOC # 22]. For the reasons set out below, the motion is granted.

\* \* \* \* \* \*

Except where otherwise noted, the following facts are not in serious dispute:

The defendant operates a shoe factory in Jonesboro, Arkansas. The plaintiff, Juanita Bobo, is a black female who was initially hired by Wolverine on November 18, 1991. In July of 1993, she left work abruptly because of a medical emergency. Her supervisor held open her position for a couple of weeks but when he did not hear from her, he officially classified her as having voluntarily quit without notice.

On September 8, 1993, she was rehired in the same department. In November of 1993, she was terminated following an incident with her acting supervisor. Wolverine's stated reasons for discharging her were refusing to perform work as assigned and using abusive language toward another employee (the supervisor). Ms. Bobo denied she acted in that manner.

In late 1995 Wolverine added a second shift. On November 20, Ms. Bobo was hired for the third time, this time as a utility operator, a position requiring the ability to operate a variety of machines. At the time she was rehired, it was discussed with her the necessity of doing work assigned to her and avoiding insubordination and the use of abusive language toward supervisors.

After a few months, the company decided to eliminate the second shift but Ms. Bobo was chosen to stay on as a day shift worker. She continued to work as a utility operator, though her principal duties were that of a "back part molder." On March 1, 1996, her job designation was changed to that of back part molder.

Shoe assembly at the Jonesboro factory is done on an assembly line. On January 23, 1997, Ms. Bobo was working at her usual job of back part molding. This position is toward the middle of the assembly process.[1] On that particular day, there were mechanical problems "upstream" where "insole tacking" was done. This contributed to a situation where at the next station "downstream," Ms. Bobo and the other back molders were all caught up and had no more work to do. Furthermore, at the next station downstream from Ms. Bobo, the toe lasters were not keeping up with the back molders' production, which in turn led to the side lasters not having enough work.

In response to this situation, Ms. Bobo's supervisor told her to temporarily work on a toe lasting machine to alleviate the bottleneck at that point of the assembly process. This reassignment was allowed under the

---

1. The pertinent portion of the assembly line contained the following work stations in this order: insole tacking, then back part molding, then toe lasting, then side lasting.

collective bargaining agreement in place at that time. The supervisor had already directed another back part molder, Donna Davis, a white female, to move to another machine to help with the backlog and she had complied.

By Ms. Bobo's own admission, she refused to move to another machine. As she testified at her deposition:

A: [The toe] lasters were behind. And Mitch came up to me—I had told him I wasn't going to—Craig had wanted me to [toe] last earlier and I told him I wasn't going to, you know, wasn't going to do it because he had six operators and six machines, you know. So I was back part molding some shoes.

And Mitch come up there and told me to go toe last. And I told him I wasn't going to do it. He told me either I go toe last or I go home. And he wanted me to run this young man's machine that had been there over his ninety day probationary period and everything and he still couldn't [get] the shoes that they needed out. And I told Mitch, you know, it wasn't right for me to go run his machine and he just stand around and not do anything. And Mitch told me, either I go do the job or I go home. So I told him I wasn't going to do it. And he—you know, it was just, you know, it was either/or. So I got my stuff and I went home.

*Deposition of Juanita Bobo,* at 49. Furthermore, she knew that the shop rules required her to work at another machine if directed to by her supervisor:

Q: ... Do you know if you were given an instruction by your supervisor to perform other duties such as that which Mr. Rutledge gave you to work on the toe lasting machine, if that's, if he did give you such an instruction?

A: Yes.

Q: Okay. Do you have to accept jobs assigned to you by your supervisor?

A: Yes.

Q: Okay. But on this occasion you chose not to, correct?

A: That's right, correct.

*Id.,* at 66–67.

Finally, it is not disputed that not only was the attempt to temporarily reassign her not based on her race, she was the *only* idle back part laster who could be moved to the toe lasting machines:

Q: You all were slow that day because you were good and because your other back part molders were good and fast and what you all had done is backed up the line ahead of you. The next person up is the toe laster, right?

A: Right.

Q: And they weren't keeping up with what you guys were doing, isn't that true?

A: That's right. Well, they wasn't keeping up, but see, it was work out there from the day before though, from the toe—

Q: But they weren't keeping up with the production that was being done by the back part molder, isn't that correct?

A: Right.

Q: And that was slowing down the operation that would be after the toe laster then, correct?

A: That was slowing down what?

Q: The next operation behind them has got to wait for the toe laster to do their job?

A: Right.

Q: So we had basically a bottleneck at the toe laster position?

A: Right.

Q: Okay. But on that date there was a problem with the insole tracker not getting the work out there as quickly as you guys needed on that day?

A: * * * I don't know whether the machine was messed up or they couldn't put them out fast enough.

Q: But you recall that there was some type of problem on that day?

A: Yes, because I was hollering, the back part molders need some work, which I always holler that.

Q: All right. So your previous statement that you had plenty of work to do isn't true because they were having problems with it, weren't they? The insole tracker was having problems keeping you guys fed enough work?

A: Right.

**Q:** Okay. Now, let me ask you this question. When Mitch asked you to go and do toe lasting on that day, on the 23rd of January '97, do you think he asked you to do it, Mrs. Bono, because you were black or he asked you to do it because you were qualified to do it?

**A:** He asked me to do it because he knew I was qualified to do it.

**Q:** Okay. Do you know if there were any other back part molders who could do toe lasting? I think you've mentioned one group was pretty new.

**A:** No, there was no—no. I was the only back part molder that toe lasted, I think, yes.

**Q:** That's all I have.

**A:** Well, no, Donna Davis—well, she was toe lasting anyway, but she was a back part molder. I don't know what she was, but she was—

**Q:** She was toe lasting that day anyway?

**A:** Right, I think so.

*Id.*, at 138–140. As stated above, Donna Davis, like the plaintiff normally a back part molder, had previously been moved to another machine to reduce the backlog.

\* \* \* \* \* \*

This case is unusual in that it is brought solely under state law, the Arkansas Civil Rights Act of 1993 (the "Act"). As both parties have aptly pointed out, there is precious little case law on the subject. Simply put, almost everyone who believes he has a civil rights claim either files exclusively under federal statutes or attaches to his federal claim a pendant state claim invoking the Act.

Be that as it may, the Act certainly protects "[t]he right to obtain and hold employment without discrimination [based on race]" A.C.A. § 16–123–107(a). However, the Act just as clearly makes clear this defense to a charge of employment discrimination: "A defendant may avoid liability under this subchapter by showing that his actions were based on legitimate, nondiscriminatory factors and not on unjustified reasons." A.C.A. § 16–123–103(c).

In Wolverine's motion for summary judgment, the defendant argues that Ms. Bobo was discharged because she refused to do work assigned her by her supervisor, not because she is black. Defendant further argues that the penalty she suffered for refusing to do the work—dismissal—was consistent with the penalties meted out to white employees. In support of these arguments, defendant has offered affidavits and/or deposition testimony from several people associated with the company, including portions of the plaintiff's own deposition.

Among this evidence is the affidavit of Robert Smith, Human Resources Director [2] at the factory, wherein he states that the company "consistently terminates employees who refuse to do jobs assigned to them by their supervisors." He also states "K* * * S* * *, a white female, was terminated for refusal to perform a basic task assigned to her." [3]

Ms. Bobo's supervisor during all three of her stints with the factory was Mitch Rutledge. He states in his affidavit that he has terminated other employees for refusing to perform job assignments, specifically naming a white female (M* * * H* * *).

The defendant has supported its motion with specific evidence which would permit an inference by the trier of fact that the plaintiff was discharged for legitimate, nondiscriminatory reasons. Having done so, it has "put the ball in plaintiff's court." As Rule 56 provides, in pertinent part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if

---

**2.** Mr. Smith is the Human Resources Director for Frolic Footwear. Frolic is the wholly-owned division of Wolverine that operates the Jonesboro plant.

**3.** The Court chooses to omit the full names of the people actually discharged.

appropriate, shall be entered against the adverse party.

Rule 56(e), Federal Rules of Civil Procedure.

Accordingly, in the instant matter the only way Ms. Bobo survives the summary judgment motion is to "set forth specific facts showing that there is a genuine issue for trial." The Court finds she has not met this burden.

The only thing submitted by the plaintiff in her response to the motion for summary judgment were excerpts from Ms. Bobo's deposition. Nowhere in the submitted excerpts does she identify evidence of discriminatory conduct on the part of the defendant. The closest she comes is naming two former employees who, if called to testify, would tell about "the difference they made between the blacks and the whites." However, according to the plaintiff, neither of these two black women were employed there at the time Ms. Bobo was discharged.

She also names the switchboard operator, a white female, as someone who could testify how well plaintiff performed her duties. However, that is not at issue here—no one disputes that *when plaintiff worked,* she did her duties well. Rather, she was terminated because she refused to work at a job assigned to her on the day in question.

Finally, plaintiff names a "Bill somebody" as a white employee who was given "two or three chances" before he was terminated. However, the only offenses of "Bill" she identifies are "missing a lot of days and everything, you know, not calling in and everything." But that is not the sort of misconduct for which the plaintiff was discharged. It is not disputed that the defendant regards refusing a direct order to perform work as being a more serious offense than excessive absenteeism.

In total, what has been offered by the plaintiff is not close to meeting the burden placed upon her by Rule 56. It might be a different story if plaintiff had bothered to attach statements from the two black women mentioned above who had been terminated. It would have been immensely helpful if she could have spelled out one or more examples of white employees who had refused to do jobs assignments given them, yet had re-

tained their jobs. However, she has not done that.

Because defendant has offered evidence of legitimate, nondiscriminatory reasons for firing the plaintiff, a defense under the Act, plaintiff had to put before the Court evidence which would permit a jury to find that the real reason she was fired was on account of her race. She has not done so. Accordingly, the defendant's motion for summary judgment is granted. This renders moot all other pending motions.

**IT IS SO ORDERED.**